UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GEORGE PAPPAS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> AUTO CLUB INSURANCE ASSOCIATION, <br><br> Defendant. | No. 20 CV 983 <br><br> Judge Manish S. Shah |

## ORDER

Defendant's motion to dismiss the complaint, [8], is granted. The dismissal is without prejudice. Any amended complaint must be filed by July 2, 2020. If plaintiff elects to refile in state court, counsel must file a status report in this case by July 2, 2020, and this case will be closed. If no amended complaint or status report is filed, this dismissal will convert to a dismissal with prejudice and the clerk will enter a final judgment. If plaintiff files an amended complaint in this court, defendant's response to the amended complaint is due by July 16, 2020.

## STATEMENT

Plaintiff George Pappas purchased a car insurance policy for his Jeep from defendant Auto Club Insurance Association. [1-1] ¶¶ 2, 21.[1] After the Jeep was involved in a collision that rendered it a total loss, *id*. ¶ 45, the Association sent Pappas a sum of money representing what it said was the actual cash value of the Jeep at the time of the collision, *id*. ¶¶ 46, 49, plus sales tax, *id*. ¶ 49; [1-1] at 73, and a $120 "title fee." *Id*. ¶ 52. Pappas purchased a replacement vehicle, *see id*. ¶ 51, and, in order to bring his new vehicle into compliance with Illinois law, paid a total of $251 in title, registration, and license plate fees. *Id*. ¶ 52. Pappas says the Association owes him the $131 difference. *Id*. ¶¶ 5, 9, 53.

Pappas originally filed this breach-of-contract and unjust-enrichment action in Illinois state court on behalf of himself and a class of other Association customers. *Id*. at 1; [1-1] ¶¶ 10, 11. The Association removed the case to federal court, [1], and I denied Pappas's motion to remand because jurisdiction exists under the Class Action

---

[1] Bracketed numbers refer to entries on the district court docket. The facts are taken from the Complaint. [1-1]. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. Paragraph numbers refer to the body of the complaint (which starts on page 4).

Fairness Act. [25]. Pappas is domiciled in Illinois, [1-1] ¶ 12, the Association is both organized under the laws of Michigan and has its principal place of business there, *id.* ¶ 15, and it is not legally impossible that Pappas's claim on behalf of a class places more than $5 million in controversy. [25]; *Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 829–30 (7th Cir. 2011); 28 U.S.C. §§ 1332(d)(2), 1453(b).

The Association now moves to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and to dismiss the class allegations under Federal Rule of Civil Procedure 23. [8]; [9]. A complaint must contain a short and plain statement that plausibly suggests a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); Fed. R. Civ. P. 8(a)(2). In ruling on a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiffs' favor, but need not accept legal conclusions, bare assertions, or conclusory allegations. *Iqbal*, 556 U.S. at 680–82. The complaint does not need to include detailed factual allegations, but it must provide more than labels and formulaic recitations of the elements of the cause of action, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and must "present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

Pappas's policy is governed by Illinois law. Parties can waive the choice of law issue by failing to assert it. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014); *Lott v. Levitt*, 556 F.3d 564, 568 (7th Cir. 2009). When neither party raises the choice of law issue, the forum state's substantive law can be applied. *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009). For the most part, both parties cite Illinois law in favor of their respective interpretations, *see* [9] at 2–7; [27] at 3–12; [30] at 2–12, and to the degree there are exceptions, those citations are made without argument as to why any other state's law should govern. *See, e.g.*, [27] at 6–7 (citing cases applying Florida and Texas law). That is reason enough to apply the law of the forum state. *Camp,* 553 F.3d at 505. In any event, under Illinois's most significant contacts test, "insurance policy provisions are generally 'governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract.'" *Cincinnati Ins. Co. v. Chapman*, 2016 IL App (1st) 150919, ¶ 44 (quoting *Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 166 Ill.2d 520, 526–27 (1995)). Pappas is domiciled in Illinois, [1-1] ¶ 12, the policy was issued to him at an Illinois address, *id.* at 23, and he paid fees associated with bringing his new vehicle into compliance in Illinois, too. *Id.* ¶ 52. Illinois has the most significant contacts with the policy.

Illinois courts interpret insurance policies according to the same general rules that apply to other kinds of contracts, *Windridge of Naperville Condo. Ass'n v. Philadelphia Indem. Ins. Co.*, 932 F.3d 1035, 1039 (7th Cir. 2019), and "initially look[]

2

to the language of a contract alone." *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462 (1999). The court's job is to "ascertain and give effect" to the parties' intentions as expressed in the policy language. *Lexington Ins. Co. v. RLI Ins. Co.*, 949 F.3d 1015, 1020 (7th Cir. 2020). If the text of the policy is unambiguous, the analysis ends and the agreement is given its "plain, ordinary, and popular meaning." *Id.* Language is ambiguous if it is either susceptible to more than one meaning or obscure in its meaning because of indefinite expression. *Id.* An agreement is not ambiguous just because the parties disagree about how to interpret it. *Id.* When the contract is attached to the complaint, it becomes part of the pleadings and can be considered and interpreted as part of a motion to dismiss under Rule 12(b)(6) without improperly resolving disputed facts or converting the motion to one under Rule 56. Fed. R. Civ. P. 10(c)("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998); *Wright v. Associated Ins. Companies Inc.,* 29 F.3d 1244, 1248 (7th Cir. 1994). If an allegation in the complaint conflicts with a document attached to the complaint, the document controls. *N. Indiana Gun & Outdoor Shows, Inc.*, 163 F.3d at 452.

In the event of a collision, the Association contracted to pay for "loss" to Pappas's Jeep, which the policy defines as "direct and accidental physical damage to … the insured car," exclusive of consequential damages like diminished value. [1-1] at 41. Even in the event of a total loss, the policy limits the Association's liability for loss to the lesser of the "actual cash value" of the insured vehicle (which is determined according to the "market value, age, and condition" of the vehicle at the time of the loss) or the amount "necessary to repair or replace" that vehicle. *Id.* at 43. (The policy also includes a limitation based on an attached certificate, *see id.*, but neither party relies on that limitation.) The cost of repair or replacement is to be determined in one of three ways: by agreement between the Association and the policyholder, by reference to a competitive bid approved by the Association, or by a written estimate based on the price charged by a majority of the local repair market. *Id.*

After Pappas's Jeep was totaled, he filed a property damage claim with the Association. [1-1] ¶ 45. A third-party vendor determined that the actual cash value of Pappas's vehicle at the time of the collision was $8,892, *id.* ¶ 46; *see also id.* at 51, and the Association paid Pappas that amount plus sales tax (7.25% of $8,892, or $644.67) and a title fee in the amount of $120. *Id.* ¶ 49. *See also id.* at 73. Pappas takes no issue with the assessment of the value of his vehicle, which he acknowledges represents the actual cash value of his vehicle at the time of the collision. *See id.* ¶ 49

If the cost of replacing the Jeep was more than $8,892, then the Association was not obligated to pay to replace it because the Association's liability for loss was limited to the lesser of the actual cash value or the cost of replacement and the actual cash value of the vehicle at the time of the collision was $8,892. [1-1] ¶ 49; [1-1] at 43.

3

Pappas does not argue that the cost of replacing the Jeep was less than $8,892. The only reasonable inference to draw from the complaint is that the actual cash value of Pappas's Jeep was $8,892, *id.* ¶¶ 46, 49, and that the actual cash value was less than the cost of replacement or repair. That is what the Association paid, *id.* ¶¶ 46, 49, and the Association never contracted to pay anything more.

Pappas's proposed interpretation of the policy's unambiguous terms is unreasonable. The policy defines actual cash value as a sum determined by reference to the "market value, age and condition" of the vehicle that suffered the loss, at the time the loss occurred. [1-1] at 43. Pappas says actual cash value includes all of the fees an owner would have to pay to make the vehicle legal to drive in Illinois, but that is not consistent with the plain, ordinary understanding of the terms "market value" or "age and condition." When purchasing a car on the market, a buyer does not normally pay to the seller the fees associated with registering the vehicle or obtaining title or and license plates. The buyer might factor those fees into his or her private estimation of how much money it will take to get back out on the road, but he or she would expect to pay those fees to the state government, not the seller. Additional expenses associated with a particular car might affect its market value, but not in an amount precisely calibrated to those fees. Market value encompasses scrap value and the value of parts—a car has market value that is independent of the legal requirements to drive it on the road. The ordinary meaning of a car's market value is not the simple addition of registration fees, title fees, or license plate fees to sales price. And "age and condition" does not suggest anything to do with registration or license plate fees. Nothing about the cash value as calculated by the third-party vendor suggests that it was applying some undervaluation of all the various factors that go into "market value."

The policy limits apply whether the Jeep suffered a loss or a total loss, regardless of the ordinary use or meaning of the term "total loss." That is how limits work—they cap the amount due regardless of how much might have been due absent the limit. *See* [1-1] at 43; *Coleman v. Garrison Prop. & Cas. Ins. Co.,* No. 19 C 1745, 2020 WL 1288873, at *2 (N.D. Ill. Mar. 18, 2020) (finding that an insurance company was not required to pay sales tax and title transfer fees because "actual cash value" was the limit of the insurance company's liability, not the amount they promised to pay).

Pappas relies on cases that involve contracts with materially different language than the one at issue here. In *Bastian v. United Services Automobile Ass'n*, the policy defined "loss" to include total losses but not to include "any damage other than the cost to repair or replace." 150 F.Supp.3d 1284, 1289–90 (M.D. Fla. 2015). That language was the crux of the court's decision that the insurer had to pay the cost of replacing the covered vehicle. *Id.* There is no such language in this policy. Plus, under the policy at issue in *Bastian* (and in *Coleman*, 2020 WL 489527 at *1), "actual

4

cash value" was defined to mean, "the amount it would cost, at the time of loss, to buy a comparable vehicle." *Bastian*, 150 F.Supp.3d at 1290. The defendants in *Bastian* had to pay sales tax because sales tax was necessarily part of the cost "to buy a comparable vehicle." *Bastian,* 150 F.Supp.3d at 1290. The policy at issue here uses a different definition of actual cash value. And in neither *Bastian* nor *Coleman* did the defendants have to pay the cost of registering the new vehicle with the state or obtaining new license plates. *Bastian,* 150 F.Supp.3d at 1290; *Coleman*, 2020 WL 489527 at *4.

In *Roth v. GEICO General Insurance Co.*, "actual cash value" was defined as "the replacement cost of the auto or property less depreciation or betterment." No. 16-62942-CIV, 2018 WL 3412852, at *3 (S.D. Fla. June 14, 2018). *See also Sigler v. GEICO Cas. Co.*, No. 118CV01446MMMJEH, 2019 WL 2130137, at *3 (C.D. Ill. May 15, 2019); *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1305 (11th Cir. 2008). Pappas's policy says that actual cash value is to be determined according to the "market value, age, and condition" of the vehicle at the time of the collision. [1-1] at 43. Rather than define actual cash value to be interchangeable with the replacement cost of the vehicle, this policy sets off the cost of replacement as an alternative and different way to measure the limit of the amount due. *Id.*

Under Texas and Florida law, when the term "actual cash value" is not defined in an insurance policy, that term includes sales tax. *Ghoman v. New Hampshire Ins. Co.*, 159 F.Supp.2d 928, 934 (N.D. Tex. 2001); *Sos v. State Farm Mut. Auto. Ins. Co.*, 396 F.Supp.3d 1074, 1079 (M.D. Fla. 2019). *See also Knuppel v. Am. Ins. Co.,* 269 F.2d 163, 166 (7th Cir. 1959) (when actual cash value was undefined and included in the indemnity clause of a fire insurance contract, it was interpreted to mean "reproduction value less depreciation for age"). This policy defines actual cash value in a manner that does not include registration fees, transfer fees, title fees (or sales tax, for that matter). In any event, the Association already paid Pappas sales tax, which it calculated using the policy limit. [1-1] at 73.

Pappas also says that he had the reasonable expectation that he would be reimbursed for registration and license plate fees when he entered into the agreement. But what matters is whether that intention was expressed in the language of the policy. *Lexington Ins. Co.*, 949 F.3d at 1020 (7th Cir. 2020); *Air Safety, Inc.*, 185 Ill.2d at 462. It was not. Even if insurance policies that promise repair or replacement are intended to make an insured whole, *see Gee v. State Farm Fire & Cas. Co.*, No. 11-CV-250, 2013 WL 8284483, at *2 (N.D. Ill. Sept. 23, 2013); *Windridge of Naperville Condo. Ass'n v. Philadelphia Indem. Ins. Co.*, 932 F.3d 1035, 1039 (7th Cir. 2019), this policy does not promise repair or replacement. This policy caps the Association's liability at the actual cash value of Pappas's vehicle at the time of the collision. Just because other contracts promise make-whole remedies that include sales tax does not mean that the Association is on the hook for registration, title, and

5

license plate fees when its policy dictates a different limit (actual cash value) that is exclusive of those fees.

Since the policy is unambiguous, the Association's post-collision communication is inadmissible to vary its terms. *Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 199 (1981); *Air Safety, Inc.*, 185 Ill.2d at 462. But even if it were admissible, that correspondence informed Pappas he would potentially—but not necessarily—be reimbursed for title fees, and title fees only. Any time a total loss is suffered, the Association sends its insureds a letter that says the insured will receive payment inclusive of "applicable state title fees." [1-1] ¶ 38. The fees Pappas seeks are not applicable here because of the policy limit and the Association's payment of the actual cash value of Pappas's Jeep. [1-1] at 43. Some of them are also not "title fees." The market valuation report that the Association sent him also does not say that the claim value will include the fees Pappas seeks, it says only that "license and fees … may need to be taken into account." [1-1] at 51. *N. Indiana Gun & Outdoor Shows, Inc.*, 163 F.3d at 454 ("when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations"). Another piece of correspondence mentions the process for receiving reimbursement for title fees, "if applicable." [1-1] at 70. *See also id.* at 73 (informing Pappas that his tax reimbursement had been processed based on the settlement amount ($8,892) plus a $120 title fee).

Both parties say Illinois's Administrative Code supports their position. [9] at 6–7; [27] at 9–12; Ill. Admin. Code tit. § 919.80. In cases of total loss and when the policy provides for the adjustment and settling of claims on the basis of actual cash value or replacement, [1-1] at 43, the Code requires that the insurance company pick between providing a replacement vehicle that meets certain standards, Ill. Admin. Code tit. § 919.80(c)(1), or a cash settlement calculated according to a few different methodologies. *Id.* § 919.80(c)(2). If the company provides a replacement vehicle, it has to reimburse the insured for "applicable sales taxes and transfer and title fees incurred on account of the purchase or lease of the vehicle." *Id.* § 919.80(c)(3)(A). If the insurance company instead provides a cash settlement, and if within thirty days of providing that settlement the insured has purchased a new vehicle, the insurance company has to reimburse the insured for "applicable sales taxes and transfer and title fees incurred on account of the purchase or lease of the [new] vehicle, but not exceeding the amount payable on account of the value of the total loss vehicle." *Id.* § 919.80(c)(3)(A)(i).

The Association draws a distinction between actual cash value payments and cash settlements. [9] at 7. That distinction is unconvincing. If the vehicle is determined to be a total loss, and if the policy provides for the adjustment of the claim on the "basis of actual cash value or replacement," then the insurance company has two options (and two options only): either replace the vehicle in compliance with

6

§ 919.80(c)(1), or provide a cash settlement based on the market value of the insured vehicle in compliance with § 919.80(c)(2). Reading the statute as a whole with an eye towards harmonizing all of its parts, *Abrams v. Royse*, 211 Ill.App.3d 283, 286 (4th Dist. 1991), the payment referred to as an "actual cash value" payment in § 919.80(c) is the same as the "cash settlement" payment referred to in § 919.80(c)(2). *See also Safe Auto Ins. Co. v. Kanyara*, 2015 IL App (1st) 140982-U, ¶ 14 ("the insurance regulations simply provide that if a consumer actually purchases a replacement vehicle 'within 30 days after receipt of the settlement' then the insurer must pay the sales tax and transfer and title fees"); *People v. Drysdale*, 2012 IL App (5th) 110259-U, ¶ 20 ("Illinois regulations governing insurers mandate that the insurer include both the sales tax and the title transfer fee in paying a claim of this type").

When the Code says that the cash settlement shall not exceed "the amount payable on account of the value of the total loss vehicle," it is limiting only the amount of "applicable sales taxes and transfer and title fees" that the company must reimburse—not the total amount of the cash settlement. Ill. Admin. Code tit. 50 § 919.80(c)(3)(A)(i). If the insured purchases a vehicle worth more than the value of the vehicle that was a total loss, the Code says that the insurance company only has to pay the "sales taxes and transfer and title fees" that would have been due had the insured purchased a replacement vehicle worth exactly as much as the value of the total loss vehicle (plus the underlying cash settlement amount). *Id.* The next sentence describes what happens if the insured purchases a vehicle worth less than the market value of the vehicle being replaced: the insurance company only has to reimburse the insured for the sales tax and transfer and title fees actually incurred. Ill. Admin. Code tit. 50 § 919.80(c)(3)(A)(i).

The complaint and its attachments demonstrate that the Association complied with the Code by adding sales tax and a title fee to cash value to arrive at the settlement it paid Pappas. [1-1] ¶ 49; [1-1] at 73. Pappas seeks reimbursement for registration and license plate fees but those are not itemized in the Code, and Pappas does not argue that he paid a transfer fee (the third payable fee listed in the Code). Neither the Code nor the contract obligate the Association to pay the "registration and license plate fees" Pappas demands in his complaint. [1-1] ¶¶ 52–53.

Pappas's complaint does not state a claim for breach of his policy. The breach of contract claim is dismissed without prejudice. *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004); *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 518 (7th Cir. 2015) ("Ordinarily … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed.")

When unjust enrichment rests on the same conduct alleged in another claim, unjust enrichment stands or falls with that claim. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019); *Horist v. Sudler & Co.*, 941 F.3d 274, 281 (7th Cir. 2019). In order to state a claim for unjust enrichment, Pappas has to allege that the Association "retained a benefit to [his] detriment" and that the Association's "retention of the benefit violates fundamental principles of justice, equity, and good conscience." *Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 2015 IL App (1st) 122725, ¶ 67. The policy in question does not require that the Association pay the registration fees or license plate fees, the Association never indicated that it would pay Pappas back for those fees in its post-collision communications, Illinois's Administrative Code at most requires reimbursement of "sales tax and transfer and title fees," and the Association already reimbursed Pappas for those expenses. The unjust enrichment claim is dismissed without prejudice too.

Since Pappas has not stated a claim for breach of this policy, he is not entitled to prospective injunctive relief prohibiting the Association from entering into contracts like this one (or settling claims like Pappas's in the manner it settled Pappas's claim) going forward. For the time being, that does away with the need to decide whether Pappas has Article III standing to seek such relief. [9] at 7–8, 15. (Although jurisdiction must be secure before addressing the merits, here, there is a case or controversy over the claim for damages.) Whether class certification is appropriate under Rule 23, [9] at 9–14, will be taken up (if necessary) should Pappas file an amended complaint that states a claim within the subject-matter jurisdiction of a federal court and seek to certify a class. *See Bandurin v. Aeroflot Russian Airlines*, 2020 WL 362781, *11 (N.D. Ill. Jan. 22, 2020).

Pappas has leave to file an amended complaint, but if he clarifies his claim to exclude unpaid taxes and injunctive relief from the case, there would likely be no federal jurisdiction over the dispute. *See* [25]. Pappas shall file either an amended complaint or a status report notifying the court that he intends to refile in state court. If no amended complaint or status report is filed by the deadline, this dismissal will convert to a dismissal with prejudice and the clerk will enter a final judgment. If Pappas refiles in state court, this case will be closed.

ENTER:

Date: June 18, 2020

Manish S. Shah
U.S. District Judge